IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KAREN MALONE,                          )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )          Civil Action No.  07-1654
                                       )
                                       )          Judge Nora Barry Fischer
ECONOMY BOROUGH MUNICIPAL              )
AUTHORITY; JAMES J. SAS; and MATTHEW   )
MARASCO, individually,                 )
            Defendants.                )

## MEMORANDUM OPINION

### I.      Introduction

        This is an employment discrimination case brought by Karen Malone ("Plaintiff") against

her former employer, the Economy Borough Municipal Authority ("EBMA"); James Sas, ("Sas"),

the Chairman of the Board of the EBMA for the relevant time period; and Matthew Marasco,

("Marasco"), the EBMA Authority Manager for the relevant time period (hereinafter, collectively

"Defendants").   Plaintiff alleges that, in retaliation for her decision to file a charge of gender

discrimination with the Pennsylvania Human Relations Commission ("PHRC") in early 2005 based

on the EBMA's decision to not give her a raise, Defendants intentionally made it difficult or

impossible for her to perform her job and then terminated her for her failure to adequately perform,

in violation of 42 U.S.C. §1983, ("§1983"), and the Pennsylvania Human Relations Act, 43 Pa. S.

§951, *et. seq*. ("PHRA").   Defendants have filed a motion for summary judgment, (Docket No.43),

arguing that Plaintiff's claims against them fail as a matter of law.   In consideration of the parties'

submissions, and for the following reasons, Defendants' motion will be denied, in part and granted,

in part.

## II.    Procedural History

Plaintiff filed a complaint against Defendants on December 5, 2007, alleging First Amendment Retaliation in violation of §1983 and retaliation in violation of the PHRA. (Docket No. 1).  Defendants filed an Answer to Plaintiff's Complaint on March 13, 2008. (Docket No. 6). Plaintiff made a First Motion to Amend/Correct Complaint on July 23, 2008, (Docket No. 15), which was granted by this Court on July 24, 2008. (Docket No. 16).

Plaintiff thereafter filed a First Amended Complaint on July 24, 2008, again alleging retaliation in violation of 42 U.S.C. §1983 and the PHRA, as well as retaliation in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et.seq.*, ("Title VII"). (Docket No. 17). Defendants filed an Answer to Plaintiff's Amended Complaint on August 13, 2008. (Docket No. 18).  On November 14, 2008, the parties filed a Stipulation of Dismissal of Count III of Plaintiff's Amended Complaint, the  Title VII claims. (Docket No. 21).  This Court granted dismissal of Plaintiff's Title VII claims on November 17, 2008.  (Docket No. 22).

 Defendants filed a Motion for Summary Judgment, (Docket No. 43) and Concise Statement of Material Facts, (Docket No. 45), on April 27, 2009.  They filed their Brief in Support of Summary Judgment and a Motion Nunc Pro Tunc to consider said brief on April 28, 2009. (Docket No. 46). The Court entered an Order on April 28, 2009, granting Defendants' Motion Nunc Pro Tunc, indicating that the Court would consider Defendants' Brief in Support of Summary Judgment as if it were timely filed. (Docket No. 48)  After an extension of time to file, (Docket No. 53), Plaintiffs filed a Brief in Opposition to Defendants' Motion for Summary Judgment, Counter Statement of

Facts and Response to Defendant's Concise Statement of Material Facts on August 3, 2009. (Docket Nos. 54-55, 58).  Additionally, Plaintiff separately filed an Affidavit of Karen Malone and Affidavit of Jaimie George. (Docket Nos. 56-57).  Defendants filed a Motion to Strike the Affidavit of Jaimie George and Brief in Support on August 27, 2009. (Docket Nos. 63-64).  The Court denied Defendants' motion by Order dated September 10, 2009. (Docket No. 71).  Defendants also filed a Response to Plaintiff's Counter Statement of Facts, as well as a Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment on August 27, 2009. (Docket Nos. 65-66). Plaintiff filed a Sur-Reply Brief in Opposition to Defendants' Motion for Summary Judgment on September 10, 2009. (Docket No. 70).  Being fully briefed on the matter, Defendants' Motion for Summary Judgment is now ripe for disposition.

**III**     **Factual Background**

Unless indicated otherwise, the following facts are undisputed.

*1.     The Administration of the EBMA*

The EBMA is a government agency of the Commonwealth of Pennsylvania, whose function is to provide sewage services to the residents of the Borough of Economy. (Docket No. 45 at ¶1; Docket No. 58 at ¶1). The EBMA is governed by a five- member Board of Directors. (Docket No. 55 at ¶2; Docket No. 65 at ¶2).  Prior to November 2005, the Chairman of the Board of Directors of the EBMA was William Herniman.  (Docket No. 55 at ¶9; Docket No. 65 at ¶9).  Sas was Vice Chairman of the Board prior to November 1, 2005, at which time William Herniman resigned and Sas became Chairman.  (Docket No. 55 at ¶¶2, 9; Docket No. 65 at ¶¶2, 9).  At the time of Plaintiff's termination in April 2006, (Docket No. 55 at ¶86), the five members of the Board of Directors included Sas, (Docket No. 44, Exh. B), Richard Mattern, (Docket No. 44, Exh. F), Jason Jasinski,

(Docket No. 44, Exh. E), Rodney Belsky, (Docket No. 44, Exh. I), and John Carl George. (Docket No. 44, Exh. G).

Plaintiff was hired by the EBMA as an office clerk in 1985. (Docket No. 45 at ¶2; Docket No. 58 at ¶2).   In her affidavit, Plaintiff indicated that her job duties as office clerk beginning in 1985 included answering the phones, receiving and posting payments, maintaining files and recording minutes from meetings of the Board of Directors. (Docket No. 55 at ¶1). She also noted that she was required to assemble packets for the monthly meetings of the EBMA Board of Directors, which included an agenda, budget, accounts payable, checks sent out and a general report on bank statements. (Docket No. 55 at ¶2).   These packets included any additional material the authority manager included such as a manager's report, office report, engineer's report, solicitor's report, list of delinquencies for the month, etc. (*Id*.) In the 1990s, her title was changed to "office manager." (Docket No. 56 at ¶4).   According to Plaintiff, when the title of her job changed, her primary duties remained the same, as did her pay. (Docket No. 56 at ¶4).

Prior to the 1990's, Plaintiff was responsible for balancing two bank accounts. (Docket No. 45 at ¶8; Docket No. 58 at ¶8).  In the 1990s, however, the EBMA began a multi-million dollar, two-phase expansion project. (Docket No. 45 at ¶13; Docket No. 58 at ¶13).  As a result of the expansion, the EBMA opened four additional bank accounts in the 1990's. (Docket No. 45 at ¶8; Docket No. 58 at ¶8).  Additionally, in 1987 the EBMA, anticipating the impending growth, hired a billing clerk for the office and installed a computer system to post payments. (Docket No. 45 at ¶9; Docket No. 58 at ¶9).   The billing clerk for the time period relevant to the instant matter was Joan Miller. (Docket No. 45 at ¶10; Docket No. 58 at ¶10).  Joan Miller's responsibilities included billing, taking payments from customers, posting payments on the computer and preparing municipal lien letters.

4

(Docket No. 45 at ¶11; Docket No. 58 at ¶11). The EBMA also hired a temporary employee, Mary Cay Gross, in early 2004 to assist with any needed tasks around the office. (Docket No.45 at ¶15; Docket No. 58 at ¶15).

The EBMA hired Marasco as an Authority Manager February 1, 2004. (Docket No. 59, Appdx. I, Exh. 1a). Marasco's position had both operating and administrative responsibilities at the EBMA. (Docket No.45 at ¶19; Docket No. 58 at ¶19).  The job description for Marasco's position provides, in relevant part:

> The Authority Manager will have the following duties and responsibilities:
>
>> (1) oversee and manage the entire operations of the Authority, including operational and administrative aspects;
>> (2) provide planning, organization and staff coordination for all Authority operations, encompassing both operations and administrative aspects; ...
>> (4) participate in financial preparation of both budgetary plan and financial results;
>>> ...
>> (6) supervise all employees of the Authority;
>> (7) timely reporting and accountability to the Board;
>>> ...
>> (9) prepare written reports as requested by the Board;
>> (10) provide oral reports to the Chairman of the Board upon request;
>> (11) attend the regular and special meetings of the Board; and
>> (12) perform other duties and functions, as from time to time, may be assigned by the Board.

(Docket No. 59, Appdx. I, Exh. 3a). Marasco's position required that he spend approximately 80% of his time at the EBMA offices, where Plaintiff was employed, and about 20 % of his time at the operating plant. (Docket No.45 at ¶22; Docket No. 58 at ¶22).  At the plant, Marasco was required to oversee the work of the plant operators.  (Docket No. 45 at ¶23; Docket No. 58 at ¶23).  At the office, Marasco was required to handle customer complaints, information coming in from the engineer's office and the solicitor's office and would handle problems with hooking up new lines

and new plant construction. (Docket No. 45 at ¶24; Docket No 58 at ¶24). He also testified that he was required to prepare a budget. (Docket No. 60, Appdx. II, Deposition of Marasco, 16 at 19-25). At meetings of the EBMA Board, Marasco would provide information on flow rates, information about plant operations and the number of taps coming in. (Docket No. 45 at ¶26; Docket No. 58 at ¶26).

Plaintiff testified that, after Marasco was hired as Authority Manager, she had greater responsibilities in her own position. (Docket No. 44, Exh. A, Deposition of Malone, p. 27 at 16-22). Specifically, Plaintiff testified:

> Q.   When Matt Marasco was hired, did he become your supervisor?
> A.   Yes, he did.
> Q.   Did your job responsibilities change after Mr. Marasco was hired?
> A.   I had more work because he was always giving me stuff to do for him, like call vendors about something. He would get things in the mail that he would want me to respond to for him.

*(Id.)*

As a result of the two-phase expansion completed during the 1990s through 2006, the EBMA customer base increased from approximately 600 to 3,000. (Docket No. 45 at ¶14; Docket No. 58 at ¶14). The second phase of the sewer expansion project, which was started in 1997, was funded through outside sources. (Docket No. 45 at ¶29; Docket No. 58 at ¶29). In 2002, PennVest, Pennsylvania Infrastructure Investment Authority, (Docket No. 60, Appdx. II, Deposition of Mark Turnley, p. 9 at 10-11), funded a loan. (Docket No. 45 at ¶29; Docket No. 58 at ¶¶29-30). In 2004, the EBMA issued bonds to finance construction of the sewer line and wastewater treatment plant. (Docket No. 45 at ¶30; Docket No. 58 at ¶30). In total, the EBMA completed the entire construction project with a debt service of 33 million dollars. (Docket no. 45 at ¶31; Docket No. 58 at ¶31).

In the year 2000, the EBMA hired Mark Turnley, a Certified Public Accountant and firm

6

owner, (Docket No. 60, Appdx. II, Deposition of Mark Turnley, p. 5 at 8), to perform independent audits. (Docket No. 45 at ¶34; Docket No. 58 at ¶34).  When Turnley began completing audits at the EBMA, it did not have a set of financial statements, such as a balance sheet or a profit and loss statement, that were required to complete the audit. (Docket No. 45 at ¶35; Docket No. 58 at ¶35). At the time, Plaintiff kept the EBMA's books in spreadsheet fashion and maintained a listing of the EBMA's categories and expenses, which she updated monthly. (Docket No. 45 at ¶36; Docket No. 58 at ¶36).  Likewise, Plaintiff kept all records of receipts of billing and other revenues in a spreadsheet, summarizing those receipts by category. (Docket No. 45 at ¶37; Docket No. 58 at ¶37). Turnley used Plaintiff's information and financial statements to perform his audits. (Docket No. 45 at ¶38; Docket No. 58 at ¶38).

After his 2004 audit, Turnley met with the EBMA Board in order to explain his accounting process and what needed to be done in order to produce basic financial statements. (Docket No. 45 at ¶40; Docket No. 58 at ¶40). At his deposition, Turnley testified that, as a result of the PennVest loan issued in 2002 and the bond issue in 2004, the Board of Directors requested an increased level of financial reporting. (Docket No. 60, Appdx. I, Deposition of Mark Turnley, p. 12 at 2-7).  Turnley specifically testified:

A.    Well, the Board had asked me after we did the 2004 audit – and that was the year that the Authority got their large bond issue, the 14 or $15 million bond issue.

It became – the Board wanted an increased level of reporting, and they asked me to come to a Board meeting and explain what the process was in the Authority and what we needed in order to be able to produce those basic financial statements that I referred to before. And in the process of having that conversation with the Board, I explained to them what [Plaintiff's] process was and the whole equation.

(*Id.*) Turnley explained to the Board that, in order to complete his audits, he would take Plaintiff's

7

records, which were recorded on a cash basis of accounting, and convert them to a full accrual basis

of accounting, in order to be compliant with generally accepted accounting principles.  (Docket No.

45 at ¶45; Docket No. 58 at ¶41). Turnley testified:

> A.     ... So there were entries that had to be made in order to consolidate or
> summarize [Plaintiff's] information into this general ledger. That also included –
> what kind of brought this to an even greater level of importance was because we were
> dealing with the bond issue, the new bond issue, the PennVest monies — [Plaintiff]
> had set up new accounts. We had new trust accounts with the trustee, and all of that
> information was not being recorded.
>
> [Plaintiff] wrote the checks to the contractors as they were needed.  There
> wasn't an issue there, but none of that information was being summarized and
> recorded into a general ledger, which was what would be needed in order to produce
> these basic financial statements.

(Docket No. 60, Appdx. II, Deposition of Mark Turnley, p. 14 at 2-25; p. 15 at 1-20; p. 16 at 1-6).

> 2.     *Plaintiff's PHRC Charge*

In early 2005, Plaintiff and another female employee, Joan Miller, filed a charge of gender

discrimination with the PHRC, as a result of the Board's decision to award raises to all three male

employees, but to deny Plaintiff and Miller raises for the year 2005. (Docket No. 55 at ¶¶3-5; Docket

No. 65 at ¶¶3-5).  Sas testified in his deposition that the Board has decided not to award Plaintiff and

Miller raises for the year 2005 because it "had taken exception to work product of the

office."(Docket No. 44, Exh. B, Deposition of Sas, p. 15 at 7-8).  Specifically, Sas testified that the

Board had concerns over "lack of proper bookkeeping, a lack of record integrity, concern over the

skill sets of the existing office employees to perform duties, and concern over the financial accuracy

of the financial statements." (Docket No. 44, Exh. B, Deposition of Sas, p. 15 at 18-21).

Marasco testified that he recommended a four percent raise for all employees of the EBMA,

including Plaintiff and Joan Miller for the year 2005. (Docket No. 60, Appdx. II, p. 30 at 13-15).

In regard to the 2005 raises, Marasco testified:

Q.    What was your knowledge of how the raises were awarded for the 2005 year? How
      did it come about that some people got raises and other people did not?
A.    It was proposed to the Board my recommendations for an increase.
Q.    You recommended that the male employees get an increase and that the female
      employees did not get an increase; is that right?
A.    No.
Q.    What did you recommend?
A.    I believe I recommended a four percent increase for everyone.
Q.    The Board eventually didn't give the women a raise; is that right?
A.    The Board initially didn't give the office staff a raise.
Q.    Who happened to be women?
A.    Yes, they were.

(Docket No. 60, Appdx. II, Deposition of Marasco, p. 38 at 3-20).

As a result of being declined raises in 2005, Plaintiff and Joan Miller filed gender

discrimination claims with the PHRC.  Marasco received a copy of the PHRC Complaint in the mail,

which he forwarded to the EBMA solicitor. (Docket No. 45 at ¶47; Docket No. 58 at ¶47). Plaintiff

was informed during the PHRC fact-finding stage that the EBMA's alleged basis for denying her and

Joan Miller a raise was poor work performance. (Docket No. 45 at ¶50; Docket No. 58 at ¶50).  The

Board settled both Plaintiff's and Miller's claims of gender discrimination at that time because it

lacked documentation exhibiting poor work performance. (Docket No. 45 at ¶49; Docket No. 58 at

¶49). Plaintiff and Joan Miller were given  retroactive raises in April 2005. (Docket No. 55 at ¶7;

Docket No. 65 at ¶7; Docket No. 59, Appdx. I, Exh. 24a).

Marasco was not part of the discussion to settle the PHRC claim, nor was he aware of a

settlement agreement. (Docket No. 45 at ¶¶52-3; Docket No. 58 at ¶¶52-3).   He became aware of

the retroactive raises at an executive session of the Board of the EBMA. (Docket No. 45 at ¶54;

Docket No. 58 at ¶54).

Richard Mattern, a member of the EBMA Board, testified at his deposition that Sas seemed

to be "disgusted" by the result of the PHRC charge. (Docket No. 44, Exh. F, Deposition of Richard

Mattern. P. 14 at 10-11).  Specifically, Mattern testified:

> Q.    Did you ever think that he exhibited some resentment or anger at having to give raises to these women who filed the charge of discrimination because they had filed the charge of discrimination?
> A.    His actions was like he was disgusted, what I observed, but there was no verbal ...
> Q.    What actions are you looking at when you say he was disgusted?
> A.    He had a copy of the document, and he basically just took it and went like this down the table (indicating).
> Q.    Threw it down the table?
> A.    Yeah, and went (gesture), "We lost."
> Q.    Shrugged his shoulders?
> A.    Yes.

(Docket No. 44, Exh. F, Deposition of Richard Mattern, p. 14 at 6-20).  Sas testified that he did, in

fact, express his displeasure at the PHRC claim in a meeting with Plaintiff on November 4, 2005:

> Q.    ... Mr. Marasco, quote, "expressed his displeasure with the fact that various female employees of the Authority, including [Plaintiff], had complained to the [PHRC] about the Authority's employment practices," end quote. Do you recall Mr. Marasco making that statement at a meeting?
> A.    I know specifically he did not.
> Q.    Did you make the statement?
> A.    I did.
> Q.    So you made the statement at the meeting?
> A.    I made the statement not in this context. I made the same statement that I always have made, that the cause for the lack of wage increases was a result of performance and that it was unfortunate that they had used a sexual harassment device to overshadow what was a performance issue.

(Docket No. 44, Exh. 44, Exh. B, Deposition of Sas, p. 63 at 1-20). Furthermore, Jason Cercone, the

plant's union steward in 2005, noted that at a plant operators' meeting in November 2005,  Sas

indicated that he was "infuriated" by the PHRC charge. (Docket No. 60, Appdx. II, Plaintiff of Jason

Cercone, p. 54 at 1-25).

10

3.      *The Implementation of Quick Books*

In early 2005, the EBMA Board asked Turnley how it could change the EBMA's record keeping system so that the records reflected the accrual basis. (Docket No. 45 at ¶61; Docket No. 58 at ¶61).  Turnley recommended that the EBMA install the Quickbooks[1] program and Plaintiff be trained to produce a general ledger.  (Docket No. 45 at ¶62; Docket No. 58 at ¶62).  Turnley suggested Quickbooks because he believed it would be the easiest transition to the accrual method of accounting for Plaintiff and because he did not believe that the EBMA required a more sophisticated software. (Docket No. 45 at ¶¶69-70; Docket No. 58 at ¶¶69-70).  Plaintiff was present for the Board's discussion of the implementation of Quickbooks and understood that she would be required to learn it. (Docket No. 45 at ¶¶62-3; Docket No. 58 at ¶¶62-3). The EBMA Board asked Turnley to oversee the installation and training of Quickbooks. (Docket No. 45 at ¶66; Docket No. 58 at ¶66).  He recommended that the Board hire Pam Wilhelm ("Wilhelm") as a consultant to install Quickbooks and train the employees on its use. (Docket No. 45 at ¶67; Docket No. 58 at ¶67).

Wilhelm and Turnley agreed that Wilhelm would go to the EBMA to implement and train on the Quickbooks program. (Docket No. 45 at ¶74; Docket No. 58 at ¶74).  Wilhelm initially billed Turnley for training and installation of the program. (Docket No. 45 at ¶75; Docket No. 58 at ¶75). According to Defendants, Wilhelm began training Plaintiff and the other office employees in June of 2005. (Docket No. 45 at ¶83).  Plaintiff disputes this fact, however, and states that Wilhelm did

---

[1]

Quickbooks is a computer program that takes general records entered, including disbursements and billing, and creates a system of receivables from that information. (Docket No. 45 at ¶72; Docket No. 58 at ¶72).  The products are designed to assist individuals who do not have a thorough knowledge of accounting practices in producing accrual basis financial information. (Docket No. 45 at ¶71; Docket No. 58 at ¶71).

11

not begin Quickbooks training until July 14, 2005. (Docket No. 58 at ¶83).

The parties dispute many of the facts related to Wilhelm's training of Plaintiff on the use of Quickbooks. According to Defendants, Plaintiff's training took excessively long because she did not complete tasks in a timely manner, as set out by Wilhelm as part of the training process. (Docket No. 45 at ¶99). In her deposition, Wilhelm testified as follows:

> Q. I was looking at this entry ... it reads, quote, "Karen has also at times not been able to complete her various assigned tasks in a timely manner. Karen has commented that she has not had enough time to complete tasks." She made that comment to you?
>
> A. When she didn't complete things from one visit to the next, she would usually say, "I didn't have time to do it."
>
> ...
>
> Q. Then later ... you say, quote, "I find Karen lacking in both accuracy and initiative to complete work. ...
>
> A. I felt at the time in my opinion that she was not applying herself and was rather sloppy with some of the work that she was doing. I felt that it was necessary for me to say these things because of how long the training was taking by that point in time.
>
> Q. So in other words, to make sure that your supervisor and the Authority knew that it was [Plaintiff's] fault and not yours that the training was taking so long?
>
> A. That was why these reports were initiated.
>
> ...
>
> Q. How long did that first cycle of training take ...?
>
> A. The first cycle actually took almost two months.
>
> Q. Is that unusual in your experience?
>
> A. For someone who is converting the work that they already do to Quickbooks, yes, that is. Usually if you go through one cycle, because the person is familiar with the books and they're familiar with the transactions, it's just a matter of teaching them the steps to record it in Quickbooks. Everything else is set up and established.

(Docket No. 44, Exh. H, Deposition of Pamela Wilhelm, p. 50 at 19-25; p. 51 at 1-3; p. 62 at 23-25; p. 64 at 11-20; p. 165 at 20-25; p. 166 at 1-6). Wilhelm reported to the EBMA Board that Plaintiff's training was taking too long and that she was observing a lack of effort on Plaintiff's part. (Docket No. 45 at ¶104).

Plaintiff testified, however, that she was unable to complete tasks as asked by Wilhelm, but

only because the office was extremely busy as a result of the Phase II implementation and she was too busy with other tasks as directed by Marasco. (Docket No. 58 at ¶99). According to Plaintiff and Wilhelm's testimony, Wilhelm trained Marasco and Miller at the same time she was training Plaintiff. (Docket No. 58 at ¶84; Docket No. 44, Exh. H, Deposition of Pamela Wilhelm, p. 34 at 3-7).   Plaintiff maintains that, as a result, not enough time was devoted to Plaintiff learning the necessary information to be able to adequately perform her job using the Quickbooks software. (Docket No. 58 at ¶84).   Furthermore, Plaintiff testified that, during training and when Plaintiff would contact Wilhelm with questions, Wilhelm was not helpful to her and would act rudely, making it impossible for Plaintiff to learn the information:

> A.      ...  I had asked for training, but every time I would call her, and this even went on before the 2006 period, she would answer me very curtly and very rudely. She would either say, like, for example, I'm driving in my car, what do you want me to do? I can't see what you're doing. How many times are you going to ask me this question? I explained this before. She was very, very rude and nasty and Joan Miller heard her on those — on most of those occasions.  One day I even put her on the – I had to call her for something and I put her on the speaker phone and I had Joan come back and listen to her.  And Mr. Marasco ... , also, he was equally as mean to me and nasty.
> 
> ...
> 
> Q.      Do you recall what area she had to train you on more than once?
> A.      It could have been any of the areas that she trained because the circumstances were so bad there and I was blocking things out. When somebody is yelling at you, more or less telling you you're stupid, we've already been over this, it was a really hostile work environment.

(Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 66 at 1-16; p. 71 at 16-25; p. 72 at 1-2). Plaintiff testified that, for a particular training session, on reconciling bank accounts, Wilhelm spent only "one brief ten-minute period" attempting to train her. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 74 at 19-20).   According to Plaintiff, "she just whipped right through all of that." (*Id.*)  Wilhelm stopped training in October 2005, but according to Plaintiff, Wilhelm had not

completed training her at this time. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 72 at 17-23).

     *4.     Plaintiff's Performance Plan and Termination*

Plaintiff testified at her deposition that Bill Herniman came into the office of the EBMA sometime in October 2005. (Docket No. 60, Appdx. III, Depo. of Karen Malone at p. 61, 21-25). According to Plaintiff, Herniman came in to pay his sewage bill and while there discussed issues involving the Board of Directors with her. (Docket No. 60, Appdx. II, Depo. of Karen Malone at p. 62, 15-32). She testified that issues of her job performance did not come up during this conversation:

> Q.     My question was, did Bill Herniman ever talk to you about your job performance?
> A.     No.
> Q.     Did he ever say, you know, Karen, you're not doing your job?
> A.     No.
> Q.     And the Board doesn't appreciate it?
> A.     No.
> Q.     Did he every say that your job could be in trouble if you didn't start to improve your job performance?
> A.     No.
>                 ...
> A.     I believe he — he commented once or twice about the time that it was taking. [The Quickbooks training] was taking too long. ...
> Q.     Did he ever indicate that it had to do with your [Quickbooks] training, in particular?
> A.     No, he did not.

(Docket No. 60, Appdx. III, Depo. of Karen Malone at p. 63, 22-25; p. 64, 1-25; p. 65, 1-6). Plaintiff thereafter received a letter from Sas, dated October 25, 2005, which stated, in relevant part:

> You met with Board Chairman, William J. Herniman on Wednesday, October 19, 2005. During the meeting, you were informed of certain deficiencies in your progress with the new billing and accounting systems training and implementation.
>
> The meeting with Bill must be considered as a verbal warning.

14

(Docket No. 59, Appdx. I, Exh. 34a). This letter informed Plaintiff that she was required to show improvement in "overall job performance" and, in particular, "comprehension and implementation of the new computer systems" by December 31, 2005, or further disciplinary action would be taken against her. *Id*. In her deposition, Plaintiff stated that she essentially ignored the letter because of the harassment she was experiencing from Sas, Marasco and Wilhelm at the time. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 80 at 1-13). However, she did send the letter to her union representative. (Docket No. 58 at ¶108).  Plaintiff did not consider her conversation with William Herniman a verbal warning. (*Id*.)

A meeting was held on November 4, 2005 between Plaintiff, Sas, Wilhelm and Marasco. (Docket No. 59, Appdx. I, Exh. 35a). Plaintiff did not have union representation with her at this meeting, even though she requested it. (Docket No. 55 at ¶12; Docket No.65 at ¶12; Docket No. 59, Exh. 41a). At this time, Sas informed Plaintiff that she would be put on a "corrective action plan." (Docket No. 45 at ¶115; Docket No. 58 at ¶115).[2]  Additionally, Sas brought up the 2005 PHRC charge.  (Docket No. 44, Exh. 44, Exh. B, Deposition of Sas, p. 63 at 1-20). In early 2006, the corrective action plan was abandoned. (Docket No. 45 at ¶125; Docket No. 58 at ¶125). Plaintiff testified that the "corrective action plan" included a time study of her daily work, but that Marasco would make her "go back and take out the stuff he didn't want in there." (Docket No. 60, Appdx. III., Deposition of Karen Malone, p. 100 at 1-10).

---

[2]

There was correspondence between counsel for the Utility Workers Union of America, AFL-CIO, System Local No. 537 and Sas regarding the appropriateness of Plaintiff's meeting with Sas, Wilhelm and Marasco without union representation. (Docket No. 59, Appdx. I, Exh. 41a).  The Union's counsel indicated that he believed the "corrective action plan" was inappropriate without the ability to engage in collective bargaining over the plan. (Docket No. 59, Appdx. I, Exh. 43a).

A subsequent meeting was held on January 11, 2006, at which Plaintiff, Sas, Marasco and union representatives Robert Potochny, Bruce Steinheiser and Jason Cercone were present. (Docket No. 45 at ¶127; Docket No. 58 at ¶127; Docket No. 59, Appdx. I, Exh. 45a).  Minutes taken by Jason Cercone indicate that Sas "explained his disapproval of the sexual harassment suite [sic] with the PHRC against the EBMA.  Mr. Sas explained that the girls did not get a raise due to the fact of their job performance. Mr. Sas is still very upset with the girls." (Docket No. 59, Appdx. I, Exh. 44a). A letter to Plaintiff from Sas documenting the meeting indicated that Plaintiff would be evaluated at the Board's February 16, 2006 meeting on her ability to close the financial operations of the EBMA for the month of January 2006. (Docket No. 59, Appdx. I, Exh. 45a; Docket No. 45 at ¶132; Docket No. 58 at ¶132).  The letter states:

> This evaluation will include:
>
> - the integrity of the traditional financial package provided to the Board no later than Monday February 13, 2006 in advance of the February 16, 2006 meeting
> - the ability to explain the financial results to the Board in a professional manner and to address and answer questions regarding the financial information and financial activities of the EBMA for the month of January.
> - The performance of necessary account reconciliations, (primarily cash), agreement of various subsidiary support including both billing (ENHANCE) and payroll and other necessary account analyses and support to validate the accuracy of the financial accounts of the EBMA.

(Docket No. 59, Appdx. I, Exh. 46a). Plaintiff was advised that she was to prepare all Quickbooks reports for the February 16, 2006 meeting without the help of Wilhelm. (Docket No. 45 at ¶136; Docket No. 58 at ¶136). In regard to this meeting, Plaintiff testified:

> A.     I believe that was the meeting that he gave me till February 12th to do a meeting packet.  He wanted it by February 12th. Pam [Wilhelm] was not allowed to do the work for me, but she was supposed to answer any questions

that I had. That was the meeting where Mr. Sas said he didn't care how I did the reports, that he didn't care if I did it on yellow paper, that he just wanted that meeting packet by February 12th. Well, the thing about me doing it the old – he said the old way or use yellow paper and the thing about doing that was Ms. Wilhelm had come in and, as I stated before, she never –nobody ever told me she was reorganizing the office. She had thrown stuff out. She had taken stuff home and that was a big no, no prior to that from the board. Nobody took anything out of the office ...

(Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 108 at 2-17).

After the January 11 meeting, Plaintiff found a Quickbooks class at a local community college, which started on the same evening as the February 16, 2006 Board meeting, and asked Sas and Marasco for permission to attend the class. (Docket No. 45 at ¶138; Docket No. 58 at ¶138). Sas refused to permit Plaintiff to take the class. (Docket No. 45 at ¶139; Docket No. 58 at ¶139). Plaintiff informed Sas that she was not capable of completing the reports for the February 16 Board meeting and requested that Wilhelm help her complete the January close. (Docket No. 45 at ¶141; Docket No. 58 at ¶141). According to Plaintiff, she attempted to continue to reconcile the financials, but Wilhelm came in to the office on February 13th to complete the packets and returned them completed on February 15th. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 139 at 10-25).

Plaintiff testified that, at the February 16, 2006 Board meeting, Sas "questioned [her] for 20 minutes to 30 minutes on the packets on the closing for the financials. I considered it to be a public embarrassment ... he knew that I didn't know the answers. ... I am not an accountant ... ."(Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 135 at 18-25). Plaintiff further testified that she had this exchange with Sas documented in the meeting minutes for February 16, 2006, but that Marasco "said he did not want that stuff in the minutes" and asked her to take it out. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 138 at 8-14).

17

Thereafter, an executive session of the Board was held to discuss alternatives to Plaintiff's termination.  (Docket No. 45 at ¶151; Docket No. 58 at ¶151). The Board then called a special meeting, which was held on April 6, 2006 to discuss Plaintiff's termination. (Docket No. 45 at ¶157; Docket No. 58 at ¶157). After this meeting, the Board voted to terminate Plaintiff, by a vote of three (3) to two (2). (Docket No. 45 at ¶159; Docket No. 58 at ¶159).  Richard Mattern voted against terminating Plaintiff because he believed that Plaintiff needed proper training. (Docket No. 45 at ¶161; Docket No.58 at ¶161). Rodney Belsky voted against terminating Plaintiff because he did not feel he had enough experience with the situation to make a decision. (Docket No. 45 at ¶163; Docket No. 58 at ¶163).

## IV.    Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure of material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©.  In deciding a summary judgment motion, the court must "'view the evidence ... through the prism of the substantive evidentiary burden' to determine 'whether a jury could reasonably find either that the plaintiff proved [her] case by the quality and quantity of evidence required by the governing law or that [she] did not.'"  *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' ...  that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the

pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co.*, 998 F.3d 1224, 1230 (3d Cir. 1993).  Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue of fact for trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.2d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

Moreover, in considering a motion for summary judgment, a district court may not "make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001) (holding that "a court must take the facts in the light most favorable to the nonmoving part, the [plaintiff], and draw all reasonable inferences in their favor") (citation omitted).

## V.     Discussion

Plaintiff's Amended Complaint alleges First Amendment Retaliation against the EBMA and Sas and Marasco, pursuant to 42 U.S.C. §1983. (Docket No. 17 at ¶¶26-31).   Additionally, she alleges retaliation as a result of her 2005 PHRC charge against the EBMA. (Docket No. 17 at ¶¶32-35).  She seeks punitive damages under both 42 U.S.C. §1983 and the PHRA for Defendants' alleged willful deprivation of her First Amendment rights. (Docket No. 17 at ¶42).

Defendants make several arguments in support of their motion for summary judgment.  First, Defendants argue that, to the extent that Plaintiff seeks to hold Sas and Marasco liable in their

official capacities as Chairman of the Board of the EBMA and the Authority manager, respectively, her claims fail. (Docket No. 46 at 3-5).  Second, Defendants argue, that both Sas and Marasco are entitled to qualified immunity and are, therefore, not liable to Plaintiff under §1983. (Docket No.46 at 5-7).

Moreover, Defendants argue that Plaintiff has failed to establish any theory of municipal liability against the EBMA as a result of the alleged conduct of Sas and Marasco. (Docket No. 46 at 9-11).  Additionally, they argue that Plaintiff has failed to establish a prima facie case of retaliation against any Defendant under either §1983 or the PHRA. (Docket no. 46 at 12-17).  Finally, Defendants argue that Plaintiff has failed to establish that she is entitled to punitive damages. (Docket No. 46 at 17-18).

The Court will address each of Defendants' arguments separately.

### Plaintiff's §1983 Claims

**A.**  **Plaintiff Has Established a Prima Facie Case of First Amendment Retaliation Under §1983**[3]

Defendants argue that Plaintiff has failed to establish a prima facie case of retaliation under §1983. (Docket No. 46 at 16-17).

Title 42, United States Code, section 1983 does not create substantive rights, but rather provides a remedy for a violation of rights created by federal law or the Constitution of the United States.  42 U.S.C. §1983; *City of Okl. City v. Tuttle*, 471 U.S. 808, 816 (1985).  In order to establish a prima facie case under §1983, a plaintiff is required to demonstrate that: (1) a "person" deprived him or her of a federal right; and (2) the person who deprived him or her of said right acted under

---

[3]

For purposes of clarity, the Court will first address Plaintiff's prima facie §1983 case, before turning to the issue of whether the Defendants are immune from suit under said Act.

color of state or territorial law. *Connecticut v. Gabbert*, 526 U.S. 286 (1999).

42 U.S.C. §1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Plaintiff claims Defendants retaliated against her in violation of § 1983 for exercising her rights under the First Amendment. (Docket No. 17 at ¶¶26- 31).

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech ... ."  U.S. Const. Amend. I.  The Amendment applies to the states, their political subdivisions, and agents thereof through the Fourteenth Amendment.  *See Virginia v. Black*, 538 U.S. 343, 358 (2003).  The First Amendment is implicated when a public employee is subjected to an adverse employment action in retaliation for his or her speech.  *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987).

In determining whether a plaintiff has established a prima facie case of First Amendment retaliation, under §1983, the Court must engage in a three-step analysis. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)); *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001).  First, the plaintiff must establish that the activity in question was protected.  *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001) (citing *Holder v. City of Allentown*, 987 F.2d 188 (3d Cir. 1993)).  Here, Defendants do not challenge the fact that Plaintiff's speech was protected. (Docket No. 46 at 12-17).[4]  Second, the plaintiff is

---

[4]

In order to show that the activity was protected, the plaintiff must show that the matter on

required to show that "the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id.* (citing *Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Watters v. City of Philadelphia*, 55 F.3d 886, (3d Cir. 1995); *Swineford v. Snyder County of Pa.*, 15 F.3d 1258, 1270 (3d Cir. 1994)). Third, once a plaintiff has established these elements, the defendant-employer can then rebut the claim by demonstrating that, absent the protected conduct, it would have taken the same adverse action. *Id.* (citations omitted). *See also Reilly v. City of Atlantic City*, 532 F.3d 216 (3d Cir. 2008) (quoting *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006)). A determination of whether a plaintiff has engaged in activity protected by the First Amendment is a question of law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006); *Baldassare*, 250 F.3d at 195. Conversely, the questions of whether a plaintiff's protected activity was a substantial or motivating factor in the retaliatory action and whether the defendant would have taken adverse action absent the protected activity are questions of fact. *Id.*; *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004). Therefore, the Court is confined at this stage to determining whether, viewing the evidence of record in a light most favorable to Plaintiff, a reasonable fact-finder could determine that her engagement in protected activity was a substantial or motivating factor in the retaliatory conduct or whether Defendants would have taken adverse action against Plaintiff regardless of her PHRC claim. *See Baldasare*, 250 F.3d at 195; *Green v. Phila. Housing Auth.*, 105 F.3d 882, 889 (3d Cir. 1997).

---

which the plaintiff spoke involved a matter of public concern and that the plaintiff's interest in the speech outweighs the state's countervailing interest as an employer. *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001) (citing *Connick v. Myers*, 461 U.S. 138 (1983)). The United States Court of Appeals for the Third Circuit has been clear that reports of sexual harassment by a governmental official are matters of public concern, expressing an interest that outweighs the government's interest, and are therefore protected speech. *See Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 975-81 (3d Cir. 1997); *c.f. Connick v. Myers*, 461 U.S. 138 (1983).

1.      *Substantial or Motivating Factor*

The determination of whether Plaintiff's participation in protected activity was a substantial or motivating factor for engaging in retaliatory conduct "embraces two distinct inquiries: 'did the defendants take an action adverse to the public employee, and, if so, was the motivation for the action to retaliate against the employee for the protected activity.'" *Schneck v. Saucon Valley School Dist.*, 340 F.Supp. 2d 558, 568 (E.D. Pa. 2004) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 800 n. 3 (3d Cir 2000)). The United States Court of Appeals for the Third Circuit has clarified the inquiry and has held that, in order to establish that retaliation was a substantial or motiving factor for purposes of a First Amendment retaliation claim brought pursuant to §1983, the plaintiff is required to show that the defendants engaged in retaliatory action and "that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted).

Defendants argue that Plaintiff has failed to provide sufficient evidence that her constitutionally protected speech was a "substantial or motivating factor" in either the decision to implement Quickbooks or to ultimately terminate her employment at the EBMA. (Docket No. 46 at 14-15).  As an initial matter, Defendants argue that none of the alleged conduct of either Sas or Marasco rises to the level of retaliatory conduct and, therefore, Plaintiff has failed to establish that retaliation was a motivating factor.  *Id*.  Defendants also argue that Plaintiff has failed to produce sufficient evidence of retaliation, because the evidence of record shows that she was terminated for her inability to adequately perform her job duties and because she has failed to establish the requisite causal connection between her protected activity and Defendants' alleged retaliatory conduct. (Docket No. 46 at 16).

### a.       Retaliatory Conduct

A defendant's conduct will be considered "retaliatory" for purposes of First Amendment retaliation if the conduct was sufficient to "deter a person of ordinary firmness from exercising [her] First Amendment rights." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). In *Suppan*, the Court of Appeals held that, where the defendants in question were alleged to have engaged in "an entire campaign of harassment which though trivial in detail may have been substantial in gross," factual questions remained as to whether said conduct rose to an actionable level under §1983. *See also McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (citing *Brennan v. Norton*, 350 F.3d 399, 422 n. 17 for the proposition that incidents of what may be characterized as trivial harassment are actionable through their cumulative impact if sufficient to deter an individual from exercising her First Amendment rights, even where the actions are *de minimis* if considered in isolation"). Indeed, "'[d]etermining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts.'" *Brennan*, 350 F.3d at 419 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)) (emphasis removed).

Here, Plaintiff contends that Defendants engaged in retaliatory conduct by deliberately failing to properly train her on Quickbooks, requiring that she complete tasks on Quickbooks despite her lack of proper training, and ultimately terminating her for her inability to complete said tasks. (Docket No. 54 at 9-10).  Specifically, Plaintiff testified that, as a result of the conduct of Sas and Marasco during the period between the implementation of the Quickbooks training and her termination, she was unable to complete her duties and was fearful about her position at the EBMA.

24

(Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 138).  She testified that both Sas and Marasco engaged in various specific acts that, together, made her life "hell" prior to her termination. (Docket No. 44, Appdx. III, Deposition of Karen Malone, p. 82-83, 119, 123-24).

Indeed, Plaintiff has adduced evidence that both Sas and Marasco took steps to harass her and make it difficult or impossible to complete her tasks as they requested.  Thus, the evaluation of Plaintiff's performance, in the form of the corrective action plan, could be understood as an attempt to have her terminated in retaliation for her PHRC charge and therefore, considered retaliatory conduct.  In particular, there is evidence that Plaintiff was given certain ultimatums by Sas prior to the February 16, 2006 meeting regarding what would be required of her at this meeting. (Docket No. 45 at ¶115; Docket No. 58 at ¶115).  However, Plaintiff testified that Wilhelm and Marasco made it impossible for her to complete these tasks.  First, Plaintiff offered testimony that Wilhelm failed to train her properly. (Docket No. 60, Appdx. III, Deposition of Karen Malone, pp. 66-72). Specifically, Plaintiff testified that Wilhelm would not answer her questions and, instead, would answer her rudely or curtly with comments such as "[how] many times are you going to ask me this question?  She was very very rude and nasty." (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 66 at 1-16).  Furthermore, Plaintiff testified that Wilhelm would train her sporadically, when other tasks needed to be completed in the office, making it difficult for her to process the information. (Docket No. 58 at ¶99; Docket No. 58 at ¶84).  Plaintiff stated that, on one specific occasion, Wilhelm spent ten minutes "flying through" training regarding reconciling bank accounts, which Sas informed her she would be required to do without Wilhelm's help for the February 16 Board meeting. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 74 at 19-20; Docket No. 59, Appdx. I, Exh. 46a). Second, Plaintiff testified that Marasco became angry if she attempted to

seek his help with the Quickbooks program and would yell at her. (Docket No. 60, Appdx. II, Deposition of Karen Malone, p. 108 at 1-25). She testified that, because Wilhelm was not properly training her on Quickbooks, she would turn to Marasco for assistance, but that he would merely become angry and tell her to ask Wilhelm (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 81 at 24-5; p. 82 at 1-7, 25; p. 83 at 4-9), who would in turn either become rude or refer her back to Marasco. *Id*.  Plaintiff testified:

> A.   If I would ask [Marasco]- I would call Pam [Wilhelm] and ask her a question and she would tell me to ask Matt [Marasco] and I would ask Matt and he would say, I'm not going to do your job for you, call Pam. And then certain things I would say to him, I would ask him a question and would say, stop it, you're killing me, and he would actually yell at me.

*Id*.  Plaintiff also testified that Marasco made it impossible for her to complete her tasks by yelling at her, often in front of customers:

> Q.   Do you know why Matt Marasco was yelling at you?
> A.   ...  There were times when he would get so upset that he would yell for no reason. ...

*Id*.

Based on this, Plaintiff testified, she was unable to train properly on Quickbooks. Accordingly she attempted to enroll in and pay for a Quickbooks program at a local community college, but Sas refused this request, again making it difficult for Plaintiff to learn the information she needed to know to do her job. (Docket No. 45 at ¶139; Docket No. 58 at ¶139).  Plaintiff testified that, as a result of the actions of Sas, Marasco and Wilhelm, it was impossible for her to meet Sas's ultimatums. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 108 at 2-17). Additionally, Plaintiff offers evidence that Sas harassed her by publicly embarrassing her at the February 16, 2006 Board meeting, and by drilling her with accounting questions that he knew she could not answer.

(Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 135 at 18-25).   Sas and two other Board members then subsequently voted to terminate Plaintiff for her failure to meet those requirements. (Docket No. 45 at ¶159).   A third member of the EBMA Board, Richard Mattern, agreed that Plaintiff had not received proper training on Quickbooks and voted against her termination. (Docket No. 58 at ¶161).

Upon review of the evidence as a whole, the Court finds sufficient facts from which a jury could determine that Defendants engaged in conduct sufficient to "deter a person of ordinary firmness from exercising [her] First Amendment rights." *Suppan*, 203 F.3d at 235. Reading the facts in a light most favorable to Plaintiff, an ordinary person could reasonably be deterred from bringing a PHRC claim against her employer if, in turn, her employer took such deliberate steps to ensure that she would be terminated from her position.

b.    *Causal Connection*

Defendants also argue that Plaintiff has failed to establish that her protected activity was a substantial or motivating factor in the alleged retaliatory conduct, insofar as she has failed to establish a causal connection between the two.   (Docket No. 46 at 16-17). Specifically, Defendants argue that Plaintiff has failed to establish an unusually suggestive temporal proximity between her PHRC claim and the alleged retaliatory conduct. (Docket No. 46 at 17).   For purposes of First Amendment retaliation claims brought pursuant to §1983, in order to establish that the plaintiff's speech was a substantial or motivating factor in the alleged adverse employment action, he or she is required to show a causal connection between the employer's adverse actions and the employee's protected activity. *DeFlaminis*, 480 F.3d at 267. *See also Brennan*, 350 F.3d at 420 (holding that "[t]he causation required to establish a claim under §1983 is identical to that required under Title

VII").

    While "'suggestive temporal proximity' is *relevant* to establishing a causal link between protected conduct and retaliatory action ... in First Amendment retaliation cases," *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 494 (3d Cir. 2002) (citations omitted) (emphasis added), it is not dispositive of the issue.  *See Deflaminis*, 480 F.3d at 267. Rather, a plaintiff may also establish the requisite causal connection by showing "a pattern of antagonism coupled with timing to establish a causal link." *Id*. (citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)).  The plaintiff may establish that causal link by offering evidence which "gleaned from the record as a whole" could lead a reasonable fact-finder to infer causation.  *Id*. (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).  Finally, Plaintiff is not required to show "but for causation;" rather, she is required to show that the "exercise of free speech rights played 'some substantial role' in the employer's decision."  *Marrero v. Camden Cty. Bd. of Social Services*, 164 F.Supp. 2d 455, 469 (D.N.J. 2001) (citing *Suppan*, 203 F.3d at 236).

    The Court finds that, reading the evidence in a light most favorable to Plaintiff, there is sufficient evidence that Defendants engaged in retaliatory conduct as a result of Plaintiff's decision to file a PHRC claim against them.  As discussed above, Plaintiff has offered evidence that Sas and Marasco engaged in retaliatory conduct. Evidence of this "pattern of antagonism," of Sas's comments about the merits of the PHRC claim, and of the timing of the corrective action plan could allow a reasonable jury to infer that when Defendants placed Plaintiff on a performance plan and then terminated her, they were motivated by her decision to bring a PHRC claim. *See Marrero v. Camden Cty. Bd. of Social Services*, 164 F.Supp. 2d 455, 469 (D.N.J. 2001) (citing *Mt. Healthy City*

*School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (3d Cir. 1977)).

First, in his deposition Sas admitted that, at the November 4, 2005 meeting with Plaintiff regarding her alleged insufficient performance and the corrective action plan, he commented that the reason for denying the 2005 raise was not gender discrimination, but performance. (Docket No. 44, Exh. B, Deposition of Sas, p. 63 at 1-20).   Nearly seven months after the PHRC charge had been resolved and the retroactive raises granted to Plaintiff and Joan Miller, Sas was revisiting the merits of the PHRC charge. *Id*.   Furthermore, other individuals, including Richard Mattern and Jason Cercone, noted that they believed that Sas was angry about the PHRC charge. (Docket No. 44, Exh. F, Deposition of Richard Mattern, p. 14 at 6-20; Docket No. 60, Appdx. II, Deposition of Jason Cercone, p. 54 at 1-25).   Jason Cercone indicated that Sas stated that he was "infuriated" by the PHRC charge in a meeting with the operating staff in November 2005, several months after the charge. *Id*.

Furthermore, the Court finds that, while the time period between the PHRC claim and Plaintiff's termination may not be unusually suggestive of retaliation, the timing of Sas's appointment to the position of Chairman of the Board and his meeting with Plaintiff regarding the implementation of the corrective action plan may be.  Sas placed Plaintiff on a corrective action plan for the first time just three days after he was made Chairman of the Board *and* made reference to the PHRC claim at the time, which may be suggestive of a connection between his actions and Plaintiff's earlier decision to file a PHRC claim.   *See George v. Genuine Parts Co.*, No. Civ. A. 04-108, 2007 WL 217684 at *11 (W.D. Pa. January 25, 2007) (holding that suggestiveness is a highly sensitive fact issue).   A reasonable jury could infer from this suggestive timing and from Sas's several statements in apparent disapproval of Plaintiff's PHRC claim, that when he decided to place Plaintiff

29

on a corrective action plan and then terminated her, he was retaliating against her for bringing said claim.  Viewing this evidence in a light most favorable to Plaintiff, the Court finds that she has offered sufficient evidence of a causal connection between her protected activity and Defendants' alleged retaliatory conduct for a reasonable fact-finder to infer that retaliation was a substantial or motivating factor in said conduct.

2.    *Defendants' Action Absent Protected Activity*

Defendants argue that the allegedly retaliatory conduct would have occurred absent the protected activity, because Plaintiff was not adequately performing her job. (Docket No. 46 at 17). However, given the many factual disputes surrounding Defendants' conduct relative to Plaintiff's performance issues and eventual termination, the Court finds that genuine issues of material fact exist regarding whether Defendants would have taken adverse action against Plaintiff absent her protected activity.   Indeed, Plaintiff has offered evidence that the alleged inadequacies in her performance were the result of Defendants' retaliatory conduct.[5] Therefore, Defendants' motion for summary judgment as to Plaintiff's prima facie §1983 case is denied.

**B.    Plaintiff Has Not Established An Official Capacity Claim Against Defendants Sas and Marasco**

In support of their motion for summary judgment, Defendants also argue that Plaintiff's official capacity claims against Sas and Marasco are duplicative of her claims against the EBMA. (Docket No. 46 at 3-5).

---

[5]

Moreover, while Defendants argue that the EBMA Board had issues with Plaintiff's performance as early as 2004, as evidenced by its decision not to give Plaintiff a raise, the Court finds this argument also fails, as there are also factual issues as to whether Defendants found flaw with Plaintiff's performance at this time.  In fact, Plaintiff's performance evaluation from 2004, completed by Marasco, indicates that she had a thorough knowledge of her job, few performance issues and was showing improvement. (Docket No. 59, Appdx. I, Exh. 10a).

At the outset, the Court notes that, from its reading of the Amended Complaint and Plaintiff's Reply and Sur-Reply to Defendants' Motion for Summary Judgment, Plaintiff does not appear to be raising official capacity claims against either Sas or Marasco. (*See* Docket Nos. 17, 54, 70).  Rather, Plaintiff has raised claims against Sas and Marasco in their individual capacities. (Docket No. 17 at p. 1).[6]  However, to the extent that Plaintiff's Amended Complaint does raise official capacity claims against Sas and Marasco, the Court will grant Defendants' motion and treat any official capacity claim as a claim against the EBMA.

A suit against a government official in his or her official capacity seeks "to impose personal liability upon a government official for actions he takes under color of state law."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974)). "Official capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id*. (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55 (1978)).  Indeed an official capacity suit against an officer of a governmental entity will be treated as a suit against the entity itself.  *Id*. (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)); *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (holding that claims against township officials in their official capacities "are only a duplication of the counts asserted against the Township itself").  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id*.

Because Plaintiff has filed a §1983 claim against the EBMA, the Court agrees with

---

[6]

Moreover, the Court notes that, in their Brief in Support of Motion for Summary Judgment, Defendants concede that it appears that Plaintiff is raising only individual capacity claims against Sas and Marasco. (Docket No. 46 at 5).

Defendants that §1983 official capacity claims against Sas and Marasco would be redundant of Plaintiff's claims against the EBMA.  As such, any official capacity claims against Sas and Marasco will be treated as identical to the claims against the EBMA and will, therefore, be dismissed. *See e.g.*, *Lopez v. Maczko*, No. 07-1382, 2007 WL 2461709 at *7 (E.D. Pa. August 16, 2007); *Johnston v. Dauphin Borough*, Civ. Action No. 05-1518, 2006 WL 1410766 at *4 (M.D. Pa. May 22, 2006).

**C.     Sas and Marasco are Not Entitled to Qualified Immunity from Liability for Alleged Violations of §1983**

Defendants also argue that Sas and Marasco are entitled to qualified immunity and, therefore, Defendants are entitled to summary judgment on all claims against Sas and Marasco. (Docket No. 46 at 5). Defendants first argue that Plaintiff has failed to specify the exact cause of action that she is bringing against Marasco and that it is undisputed that he played no part in her termination. *Id.* Defendants further argue that Plaintiff has failed to provide sufficient evidence that either Sas or Marasco violated any of her Constitutional rights. *Id.*

As a threshold matter, the Court will address Defendants' argument that Plaintiff has failed to specify an exact cause of action against Marasco.  Plaintiff's Amended Complaint alleges that Marasco, acting at the "behest of or with the explicit assent of Sas " "began a campaign of daily harassment and hostility which interfered with and impeded [Plaintiff's] performance of routine day-to-day tasks, which she [sic] pursued for years." (Docket No. 17 at ¶¶ 16-17).  Plaintiff further avers that, at the "behest and direction of Sas and Marasco" the EBMA "falsely accused [Plaintiff] of not performing her work, placed [Plaintiff] on a performance improvement program" and eventually terminated her.  (Docket No. 17 at ¶¶20-24).  Plaintiff also pleads that Marasco was her manager at the EBMA and that his conduct and actions were "either directed by Sas or undertaken with  assent

and knowledge." (Docket No. 17 at ¶25).  In Count I of Plaintiff's Complaint, she alleges that the Defendants retaliated against her for filing a charge of gender discrimination with the PHRC. Docket No. 17 at ¶¶26-31).  Based on these allegations, the Court finds that Plaintiff has clearly pled a claim for First Amendment Retaliation pursuant to §1983 against Marasco.[7] The Court turns now to Defendants' argument that Sas and Marasco are entitled to qualified immunity.

Qualified immunity is an affirmative defense for government officials subject to §1983 actions and must be pled by the official against whom a §1983 action has been brought.  *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)).  "'The qualified immunity defense shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)).  In determining whether a government official defendant is entitled to qualified immunity, the Court engages in a two-step inquiry:

> [T]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? ... If there would be no violation of a constitutional right under the facts alleged, the Court's inquiry ceases. ... However, if the facts alleged make out a violation, the Court must ask whether the right was clearly established; in other words, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

---

[7]

In Count II of her Complaint, and in later filings, Plaintiff admits that her PHRA claim is directed against the EBMA only and not against the individual Defendants Sas and Marasco. (See Docket No. 17 at ¶¶32-35; 54 at 11).

*Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (quotations omitted).[8]

The determination of whether a government official's conduct clearly violates a plaintiff's constitutional rights is a question of law to be determined by the Court; however, when the determination is dependent upon disputed factual issues, the question is more properly resolved by a jury. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995)). In resolving questions of qualified immunity, the Court must undertake "a careful examination of the record ... to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff.)." *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) (citations omitted). The determination of whether a government official is shielded by qualified immunity generally requires an objective assessment of the official's conduct. *Harlow*, 457 U.S. at 818. And, "[i]t is now widely understood that a public official who knows he or she is violating the constitution nevertheless will be shielded by qualified immunity if a 'reasonable public official' would not have known that his or her actions violated clearly established law." *Grant*, 98 F.3d at 123-24. However, in determining whether qualified immunity is a proper defense, "an inquiry into the defendant's state of mind is proper where such state of mind is an essential element of an underlying civil rights claims." *Id*. *See also Monteiro*, 436 F.3d at 406 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 593-94 (1998)) ("Qualified immunity does not

---

[8]

The United States Supreme Court has recently clarified that the order of these two steps is not mandatory and that the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan,* 129 S.Ct. 808, 818 (2009). The Court will address them in the traditional order.

require a plaintiff to demonstrate that the official's conduct was not reasonable under any conceivable set of circumstances.... [Rather], it is sufficient for the plaintiff 'to identify affirmative evidence from which a jury could find ... the pertinent motive,' in order to survive summary judgment on that issue.").

Defendants argue that Plaintiff's claims fail to establish the first step of the inquiry by offering sufficient facts that Sas and Marasco violated a constitutional right. Therefore, Defendants argue, the inquiry need not proceed to the second step, as Sas and Marasco are entitled to qualified immunity. (Docket No. 46 at 7). The Court finds, however, that there are genuine issues of material fact as to whether Sas and Marasco violated a constitutional right that are more properly left to a jury to resolve.

In this case, Plaintiff has alleged that Sas and Marasco violated her constitutional right to free speech under the First Amendment of the Constitution of the United States. (Docket No. 17 at ¶26). Specifically, Plaintiff avers that Marasco and Sas engaged in harassing conduct and eventually wrongfully terminated her in retaliation, after Plaintiff filed a PHRC charge of gender discrimination.(Docket No. 17 at ¶27-29). Plaintiff has offered sufficient evidence from which a reasonable jury could infer that such a violation occurred.

As discussed above in the Court's analysis of Plaintiff's prima facie case, reading the record in a light most favorable to Plaintiff, there is sufficient evidence from which a reasonable jury could infer that Sas and Marasco engaged in harassing conduct and terminated Plaintiff as a result of her PHRC claim. Therefore, at this stage, the Court cannot say as a matter of law that Sas and Marasco are entitled to qualified immunity[9] and Defendants' motion as to qualified immunity will be denied.

---

[9]

The Court notes that Defendants do not argue that Plaintiff has failed to establish the second

*See e.g.*, *Costenbader-Jacobson v. Pa*, 227 F.Supp.2d 304, 314 (M.D. Pa. 2002) (holding that, where

the nature of the defendants' actions and reasons for the plaintiff's termination were in dispute, the

question of whether the plaintiff's constitutional rights were violated was for the jury); *Kantamanto*

*v. King*, — F.Supp. 2d — 2009 WL 1922296 at *10 (E.D. Pa. 2009) (citing *Larsen v. Senate of Pa.*,

154 F.3d 82, 86-7 (3d Cir. 1998) (holding that, where the plaintiff has established a genuine issue

of fact as to whether he was terminated in retaliation for exercising his First Amendment rights, it

must be assumed, for purposes of qualified immunity, that the plaintiff had met his burden of

showing that his constitutional rights had been violated); *Russoli v. Salisbury Twp.*, 126 F.Supp. 2d

821, 857 (E.D. Pa. 2000) (holding that, while "[a] bare allegation of retaliatory motive is not

necessarily sufficient to defeat an assertion of qualified immunity as to a retaliation claim," where

the defendants had not "undisputedly demonstrated that their motivations were fair" there was no

qualified immunity).

**D.     Plaintiff Has Established Municipal Liability Against the EBMA for Violations of §1983**

Defendants further argue that Plaintiff has failed to establish that the EBMA is liable under

§1983, insofar as she has failed to establish municipal liability. (Docket No. 46 at 9-11). Moreover,

---

step of the qualified immunity inquiry, *i.e.*, whether a reasonable official in Sas and/or Marasco's
position would not have known that he or she was violating Plaintiff's constitutionally protected
rights. (Docket No. 46 at 7). Moreover, the Court notes that Sas and Marasco were each in high level
positions at the EBMA and were educated individuals with experience in management who were
aware of her prior claim PHRA claim and the outcome. Reasonable individuals in their positions
would know that harassing and ultimately terminating an employee for participating in a gender
discrimination suit would violate clearly established law. *See Suppan*, 203 F.3d at 235*; Balas v.
Taylor*, 567 F.Supp. 2d 654 (D. Del. 2008) (holding that, given the factual scenario alleged by the
plaintiff, a reasonable officer in the official's position could not have believed that his actions were
constitutionally permissible).

Defendants argue, Plaintiff has failed to establish that the EBMA terminated Plaintiff as a result of her protected activity. (Docket No. 46 at 11).  Finally, Defendants argue that they have sufficiently established that the EBMA would not have treated Plaintiff any differently absent her participation in protected activity. (Docket No. 46 at 11).[10]

In order for a government entity to be liable under §1983, it is not enough that the plaintiff merely "identify conduct properly attributable to the municipality."  *Bd. of County Commissioners of Bryan Cty, Okla. v. Brown*, 520 U.S. 397, 404 (1997).  Rather,

> [A] local government may not be sued under §1983 for any injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under §1983.

*Monell v. Dept. of Social Serv.'s of City of N.Y.*, 436 U.S. 658, 694 (1978); *See also McGreevy v. Stroup*, 413 F.3d 359 (3d Cir. 2005).  Indeed, a plaintiff is required to show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original). The United States Court of Appeals has held that a municipality will be liable for the conduct of its employees in one of three ways:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate,

---

[10]

Defendants' third argument addresses whether Plaintiff has established a prima facie case of First Amendment Retaliation under §1983 and is not directly related to the issue of whether Defendant, as a municipality, may be sued for the conduct of its agents.  Therefore, the Court addressed this argument in its discussion of Plaintiff's prima facie case, *supra*.

rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

*McGreevy*, 413 F.3d at 376.  Additionally, the plaintiff is required to show a direct causal link between the actions of the municipality and the alleged deprivation of constitutional rights.  *Id.*

In this case, the issue is whether liability attaches to the EBMA as a result of the actions of Sas, Chairman of the Board of the EBMA and Marasco, the Authority Manager.  In regard to Sas, the issue is whether he a was a policy maker who had "final, unreviewable discretion to make a decision or to take action." *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481 (3d Cir. 1990)). Defendants argue that, because the Board voted to terminate Plaintiff by a vote of three to two, the decision to terminate cannot be solely attributed to Sas. However, the Court finds that this argument fails to take into consideration several facts.  First, Sas was the Chairman of the Board of Directors and thus, it could be reasonably inferred that he was in a position to influence other members of the Board, particularly when the evidence shows that, as the highest ranking member of the Board, he was the member in direct contact with Plaintiff regarding her purported performance issues. (Docket No. 44, Exh. B, Deposition of Sas, p. 58 at 10-14).  Second, Plaintiff has offered evidence that almost immediately after Sas became Chairman of the Board, action was taken regarding her employment in the form of a corrective action plan.  In fact, Sas was the sole Board member present at the November 4 meeting, where the corrective action plan was explained to Plaintiff. (Docket No. 59, Appdx. I, Exh. 35a).  He was also the Board member in contact with Marasco and Wilhelm in regard to the Quickbooks training.  Wilhelm, in fact, sent information related to the length of time it was taking to complete Quickbooks training with Plaintiff (which Plaintiff maintains was part of the overall plan to retaliate against her) to Sas,

38

Marasco, Kim Turnley and the EBMA solicitor, but not to any other Board members. (Docket No. 44, Appdx. I, Exh. 38a; 39a). Third, Sas was the Board member at the January 11 meeting who verbalized certain demands of Plaintiff. (Docket No. 59, Appdx. I, Exh. 46a; Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 108). Given all of these facts, a reasonable fact-finder could find that Sas had implemented a course of intentional conduct to ensure that other members of the Board believed Plaintiff's termination was appropriate and that the decision to terminate her could be attributed to him. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 246 (3d Cir. 2006) (holding that, while only the Borough council had the authority to terminate the plaintiff, the Borough mayor, through his conduct and harassment, constructively discharged the plaintiff, giving him the requisite policy-making authority).

In regard to Marasco, the issue is whether the EBMA may be held liable for his conduct, insofar as he participated in unconstitutional conduct that was ratified by a policy-making authority. *McGreevy*, 413 F.3d at 376. Here, as discussed above, Plaintiff has offered evidence that at the time that Sas was engaging in certain conduct relative to her employment with the EBMA, Marasco was engaging in conduct that could be reasonably viewed as affecting her ability to engage in free speech. There is evidence that Marasco's job position required that he act at the behest of the Board and report to them. (Docket No. 44, Exh. B, Deposition of Sas, p. 20 at 16-17). Additionally, there is evidence that Marasco was present with Sas on occasions where issues with Plaintiff's employment were discussed, and that Marasco was then charged with implementing the corrective action plan. (Docket No. 60, Appdx. III, Deposition of Karen Malone, p. 100 at 1-25). Given this evidence, it could reasonably be inferred that Marasco engaged in unconstitutional conduct that was ratified by Sas, a policy-making authority on the EBMA Board. As such, Plaintiff has sufficiently established

municipal liability against the EBMA as a result of both Sas's and Marasco's conduct and Defendants' motion will, therefore, be denied on this issue.

### Plaintiff's PHRA Retaliation Claim

Defendants argue that Plaintiff has failed to establish a retaliation claim against the EBMA under the PHRA. (Docket No. 46 at 12-17). The requirements for establishing a prima facie case under the PHRA are similar to those of a First Amendment Retaliation claim brought under §1983. A plaintiff must show: (1) protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (2) and causal connection between the employee's protected activity and the adverse action. *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 300 (3d Cir. 2007); 43 P.S. §955(d). A plaintiff advancing a claim of retaliation under the PHRA may proceed under a "pretext" theory of retaliation. *Id*. (citing *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005)) (citations omitted).[11] Therefore, retaliation claims under the PHRA are subject to the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). *Id.*; *See also Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (citing *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993); *Waddell v. Small*

---

[11]

In their Reply to Plaintiff's Response to Summary Judgment, Defendants contend that Plaintiff's PHRA claim is not appropriately analyzed under a pretext analysis. (Docket No. 66 at 3). The Court notes, however, that the United States Court of Appeals in *Marra* unequivocally used a pretext analysis to analyze the plaintiff's claims that his employer unlawfully retaliated against him in violation of the PHRA for testifying against the employer in an employment discrimination suit. *See Marra*, 497 F.3d at 306. As Plaintiff argues, her claims are based on the PHRA's language prohibiting retaliation against employees seeking recourse under its provisions. *See* 42 Pa. C.S. §955(d); *See also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 564 (3d Cir. 2002) (noting that the anti-retaliation provisions of the PHRA prohibit discrimination against any individual because such individual has engaged in protected activity). Allegations that a plaintiff was retaliated against as a result of participating in a claim brought under the PHRA certainly proceed under a pretext theory. *Marra*, 497 F.3d at 300.

*Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)) (holding that the "allocation for the burden of proof for both federal and state retaliation claims follows the familiar Title VII standards").

Under this framework, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action. *Id.* (citing *Woodson*, 109 F.3d at 920 n. 2) (citations omitted). *See also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). If the employer meets this relatively light burden, the burden of production then shifts back to the employee, who must show by a preponderance of the evidence that "'the employer's proffered explanation was false and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)) (citations omitted).

Plaintiff has alleged that she was retaliated against as a result of a charge she brought under the PHRA in early 2005. (Docket No. 70 at 2). As discussed above, Defendants challenge whether Plaintiff has sufficiently established an adverse employment action and a causal connection between Defendants' actions and Plaintiff's protected activity. The Court has already found, in its analysis of Plaintiff's First Amendment Retaliation claim, that Plaintiff has offered sufficient evidence to allow a jury to decide that the harassment, in the form of a corrective action plan and her eventual termination, constituted an adverse employment action. Furthermore, as discussed above, Plaintiff has offered sufficient evidence of a causal connection between Defendants' conduct and said adverse actions. Thus, she has likewise sufficiently demonstrated a prima facie case of retaliation under the PHRA to be tried by a jury.

While Defendants do not specifically address Plaintiff's pretext arguments, they do argue that the adverse employment action taken against Plaintiff was done so for the legitimate reason that

41

Plaintiff was not performing her job as expected by the Board and was in no way motivated by retaliatory motives. (Docket No. 66 at 3-5). As discussed at length above, Plaintiff has offered sufficient evidence that she was retaliated against as a result of her participation in the 2005 PHRC claim.

In order to show pretext, a plaintiff is required to show that the employer's proffered legitimate reasons for the adverse employment action could reasonably be found "'unworthy of credence.'" *Marra*, 497 F.3d at 306 (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997)) (citations omitted). "'A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully retaliated.'" *Id.* (quoting *Fasold*, 409 F.3d at 185) (quotations omitted). Here, Plaintiff has offered the direct evidence of Sas's statements regarding Plaintiff's PHRC claim as evidence of his retaliatory animus. (Docket No. 44, Exh. B, Deposition of Sas, p. 63 at 1-20; Docket No. 60, Appdx II, Deposition of Jason Cercone, p. 54 at 1-25). Furthermore, she has offered circumstantial evidence that both Sas and Marasco harassed her, making it impossible to do her job and then terminated her for her failure to adequately perform. (Docket No. 60, Appdx II, deposition of Karen Malone, pp. 81-3; p. 108 at 1-25). Based on said evidence, the Court finds that, even if Defendants have proffered a legitimate, non-discriminatory reason for taking adverse employment action, Plaintiff has met her burden by producing sufficient evidence of pretext.

### Plaintiff's Claim for Punitive Damages

Defendants make several arguments in regard to Plaintiff's claim that she is entitled to punitive damages. First, Defendants argue that Plaintiff's Complaint appears to allege that she is entitled to punitive damages from Sas, only. Secondly, Defendants argue that Plaintiff has failed to

establish liability against Sas in his official capacity.  Thirdly, they argue that Plaintiff is not entitled to punitive damages under the PHRA, as it does not provide for punitive damages.  Finally, in regard to Plaintiff's individual capacity claims, Defendants argue that Plaintiff has failed to produce evidence of a deprivation of Plaintiff's rights or of malice or reckless indifference to Plaintiff's Constitutional rights.

Section 1983 precludes punitive damages against a municipality.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Bolden v. Southeastern Pa. Transp. Authority*, 953 F.2d 807, 830 (3d Cir. 1991). Thus, to the extent that Plaintiff's Amended Complaint seeks punitive damages against the EBMA, said damages are not available.

However, §1983 does not preclude punitive damages against individual defendants where the defendants have acted with a "'reckless or callous disregard of, or indifference to, the rights and safety of others.'" *Keenan v. City of Philadelphia*, 983 F.3d 459, 469-70 (3d Cir. 1992) (quoting *Bennis v. Gable*, 823 F.2d 723, 734 (3d Cir. 1987)) (citation omitted). "'Despite its utility as a deterrent, the punitive damages remedy must be reserved ... for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief.'" *Id*. (quoting *Cochetti v. Desmond*, 572 F.2d 102, 105-06 (3d Cir. 1978)).

In this case, as discussed above, Plaintiff has offered evidence that both Sas and Marasco engaged in deliberate conduct to retaliate against her for previously bringing a PHRC claim against the EBMA.  Whether said conduct rose to the level of reckless or callous disregard is more properly left for a jury to determine and, therefore, Defendants' motion for summary judgment on punitive damages will be denied as to the claims against the individual defendants.

Furthermore, regarding Defendants' argument that Plaintiff's Amended Complaint appears

to seek punitive damages from Sas alone, the Court notes that Plaintiff's Amended Complaint seeks "all relief that is appropriate under 42 U.S.C. §1983." (Docket No. 17 at ¶31).  While Plaintiff then specifically seeks an award of punitive damages against Sas in his individual capacity, since there is a genuine issue of fact as to whether punitive damages would be available under §1983 against Marasco (as discussed above), said relief may also be appropriate.  Whether punitive damages are appropriate against Sas and Marasco is, again, a question of fact for a jury.

**VI.     Conclusion**

Based on the foregoing, the Court finds that, to the extent that Plaintiff (1) has brought official capacity claims against Sas and Marasco; and (2) seeks punitive damages against the EBMA, her claims fail and will therefore be dismissed.  However, Defendants' motion for summary judgment on Plaintiff's individual capacity claims against Sas and Marasco and claims against the EBMA for violations of §1983 is denied.  Likewise, Defendants' motion for summary judgment on Plaintiff's PHRA claims against the EBMA is denied.

An appropriate Order follows.

s/ Nora Barry Fischer
Nora Barry Fischer
United States District Judge

Dated:          November 9, 2009
cc/ecf:         All counsel of record.